# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

Nos. 13-2131(L) and 13-2211
(1:07-cv-03442-WMN)

_____

DENISE MINTER, *et al.*, Individually and on behalf of a Class of persons
similarly situated,

Plaintiffs/Appellants/Cross-Appellees,

v.

PROSPERITY MORTGAGE COMPANY; WELLS FARGO BANK, N.A.;
WALKER JACKSON MORTGAGE CORPORATION; WELLS FARGO
VENTURES, LLC; THE LONG & FOSTER COMPANIES, INC.; LONG &
FOSTER REAL ESTATE, INC.,

Defendants/Appellees/Cross-Appellants.

_____

## <u>RESPONSIVE BRIEF OF APPELLEES</u>

_____

## Table of Contents

**Page**

I.    JURISDICTIONAL STATEMENT ................................................ 1

II.    STATEMENT OF THE ISSUES ................................................ 1

III.   STATEMENT OF THE CASE ................................................ 2

    A.    General Background And Pre-Trial Procedural History ...................... 3

    B.    The Trial ................................................................ 5

    C.    The Special Verdict Form ................................................ 6

    D.    Plaintiffs' Individual Claims Pursuant To RESPA Section 8(a) ........... 7

    E.    Post-Verdict Proceedings ................................................10

IV.    STANDARD OF REVIEW ................................................11

V.    SUMMARY OF ARGUMENT ................................................12

VI.    ARGUMENT ................................................15

    A.    The District Court's Denial Of Plaintiffs' Rule 59 Motion Was Well Within Its Discretion And Supported By The Record And The Law. .........15

        1.    Plaintiffs invited the submission of Question 3 to the jury and cannot now object to it. ................................................15

        2.    The submission of Question 3 to the jury was not plain error. ...............18

        3.    Plaintiffs' failure to move for judgment forfeited any opportunity to challenge the sufficiency of the jury's verdict. ................................21

        4.    The jury's verdict was well-supported by evidence. ..............................22

        5.    Defense counsel's statement in closing argument does not require a new trial. ................................................28

    B.    The District Court Properly Dismissed Binks's Section 8(a) Claim. .....36

        1.    Plaintiffs abandoned Binks's individual Section 8(a) claim by failing to raise them below. ................................................37

        2.    In any event, the District Court properly dismissed Binks's Section 8(a) claim because it was time barred. ................................................39

    C.    The Admission Of Evidence Regarding Prosperity's Competitive Pricing Was Neither Erroneous Nor Prejudicial. ................................................42

1.    The District Court properly allowed limited testimony regarding the fairness of plaintiffs' loan transactions and Prosperity's competitive pricing..........................................................................................42

2.    The challenged evidence is relevant to plaintiffs' substantive claims and thus its admission cannot form a basis for reversal........................................45

3.    Even if improper, admission of the challenged evidence did not "substantially sway" the judgment and thus was harmless error...................48

**D.    The District Court Properly Overruled Plaintiffs' Objection To A Statement Made By Wells Fargo's Counsel In Closing Argument.** .............50

**VII.    CONCLUSION**.........................................................................................55

## Table of Authorities

### Cases

*AG Sys., Inc. v. United Decorative Plastics Corp.*,
    55 F.3d 970 (4th Cir. 1995) ................................................................. 13, 16, 18

*All Freight Sys. v. James*,
    115 F. App'x 182 (5th Cir. 2004) .......................................................... 54

*Aves v. Shah*,
    997 F.2d 762 (10th Cir. 1993) ............................................................... 18

*Brinkley-Obu v. Hughes Training, Inc.*,
    36 F.3d 336 (4th Cir. 1994) .................................................................. 50

*Bristol Steel & Iron Works v. Bethlehem Steel Corp.*,
    41 F.3d 182 (4th Cir. 1994) ...................................................... 11, 13, 21, 22

*Brumbaugh v. Princeton Partners*,
    985 F.2d 157 (4th Cir. 1993) ............................................................. 40, 41

*Bufford v Rowan Companies, Inc.*,
    994 F.2d 155 (5th Cir. 1993) ............................................................. 53, 54

*Chao v. Va. Dep't of Transp.*,
    291 F.3d 276 (4th Cir. 2002) ......................................................... 39, 40, 42

*Childs v Franco*,
    563 F. Supp. 290 (E.D. Pa. 1983) ........................................................ 35

*Coral v. Gonse*,
    330 F.2d 997 (4th Cir. 1964) ............................................................... 36

*Corti v. Storage Tech. Corp.*,
    304 F.3d 336 (4th Cir. 2002) ............................................................... 19

*Deadwyler v. Volkswagen of Am., Inc.*,
    884 F.2d 779 (4th Cir. 1989) ............................................................... 18

*Denison v. Swaco Geolograph Co.*,
    941 F.2d 1416 (10th Cir. 1991) ............................................................ 45

*Dillon v. Maryland-Nat'l Capital Park & Planning Comm'n*,
    258 F. App'x 577 (4th Cir. 2007) ......................................................... 50

*Egerer v. Woodland Realty, Inc.*,
    556 F.3d 415 (6th Cir. 2009) ............................................................... 41

*Eli Lilly & Co. v. Valeant Pharms. Int'l*,
2011 WL 573761(S.D. Ind. Feb. 15, 2011) .......................................................31

*Finjan, Inc. v. Symantec Corp.*,
2013 WL 5302560 (D. Del. Sept. 19, 2013) .................................................33, 35

*FOP Lodge No. 89 v. Prince George's County*,
608 F.3d 183 (4th Cir. 2010) ............................................................................29

*Ford ex rel. Estate of Ford v. Garcia*,
289 F.3d 1283 (11th Cir. 2002) ........................................................................18

*Gardner v. First American Title Ins. Co.*,
2003 WL 221844 (D. Minn. Jan. 27, 2003) ......................................................22

*GO Computer, Inc. v. Microsoft Corp.*,
508 F.3d 170 (4th Cir. 2007) ......................................................................40, 42

*Gregg v. Ham*,
678 F.3d 333 (4th Cir. 2012) ............................................................................19

*Hall v. Wal-Mart Stores, East L.P.*,
447 F. Supp. 2d 604 (W.D. Va. 2006) ...............................................................35

*Harrison Construction Co. v. Ohio Turnpike Com.*,
316 F.2d 174 (6th Cir. 1963) ..........................................................31, 32, 33, 34

*Howland v. First Am. Title Ins. Co.*,
672 F.3d 525 (7th Cir. 2012) ............................................................................. 4

*Kay v. Wells Fargo & Co.*,
247 F.R.D. 572 (N.D. Cal. 2007) ......................................................................41

*Keller v. United States*,
58 F.3d 1194 (7th Cir. 1995) ............................................................................33

*King v. McMillian*,
594 F.3d 301 (4th Cir. 2010) ............................................................................12

*Konkel v. Bob Evans Farms, Inc.*,
165 F.3d 275 (4th Cir. 1999) ............................................................................11

*Kotteakos v. United States*,
328 U.S. 750 (1946) ..........................................................................................48

*Link v. Wabash R. Co.*,
370 U.S. 626 (1962) ..........................................................................................37

*Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*,
43 F.3d 922 (4th Cir. 1995) ..............................................................................39

v

*McCaskill v. SCI Mgmt. Corp.*,
    298 F.3d 677 (7th Cir. 2002) ................................................................ 35

*McDonough Power Equip., Inc. v. Greenwood*,
    464 U.S. 548 (1984) ............................................................................... 48

*Nichols v. Ashland Hosp. Corp.*,
    251 F.3d 496 (4th Cir. 2001) ................................................... 21, 22, 28

*Oscanyan v. Arms Co.*,
    103 U.S. 261, 26 L. Ed. 539 (1880) ...................................................... 35

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987) ................................................................ 41

*Puckett v. United States*,
    556 U.S. 129 (2009) ............................................................................... 19

*Robinson v. McNeil Consumer Healthcare*,
    671 F. Supp. 2d 975 (N.D. Ill. 2009) .............................................. 29, 30

*Rohn Prods. Int'l LC v. Sofitel Capital Corp. USA, Inc.*,
    2010 WL 681304 (D. Md. Feb. 22, 2010) ............................................ 33

*Smith v. Amedisys Inc.*,
    298 F.3d 434 (5th Cir. 2002) ..................................................... 12, 37, 38

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*
    71 F.3d 119 (4th Cir. 1995) .................................................................. 40

*United States v. Adams*,
    335 F. App'x 338 (4th Cir. 2009) .................................................... 52, 53

*United States v. Belculfine*,
    527 F.2d 941 (1st Cir. 1975) ................................................................ 36

*United States v. Bennafield*,
    287 F.3d 320 (4th Cir. 2002) ................................................................ 16

*United States v. Byers*,
    649 F.3d 197 (4th Cir. 2011) ................................................................ 48

*United States v. Cotton*,
    535 U.S. 625 (2002) ............................................................................... 20

*United States v. Dominguez Benitez*,
    542 U.S. 74 (2004) ................................................................................. 19

*United States v. Duckett*,
    861 F.2d 715 (4th Cir. 1988) ................................................................ 53

*United States v. Gomez,*
  705 F.3d 68 (2d Cir. 2013) ...................................................................20

*United States v. Grooms*,
  2 F.3d 85 (4th Cir. 1993) ......................................................................49

*United States v. Halteh*,
  224 F. App'x 210 (4th Cir. 2007) ....................................................44, 45

*United States v. Heater*,
  63 F.3d 311 (4th Cir. 1995) ..................................................................48

*United States v. Hickman,*
  626 F.3d 756 (4th Cir. 2010) ...........................................................16, 18

*United States v. Jackson,*
  124 F.3d 607 (4th Cir. 1997) ................................................................16

*United States v. Johnson*,
  54 F.3d 1150 (4th Cir. 1995) .............................................12, 46, 49, 50

*United States v. Leftenant,*
  341 F.3d 338 (4th Cir. 2003) ...........................................................44, 48

*United States v. Lespier*,
  725 F.3d 437 (4th Cir. 2013) ................................................................20

*United States v. Olano,*
  507 U.S. 725 (1993) ......................................................18, 19, 20

*United States v. Runyon,*
  707 F.3d 475 (4th Cir. 2013) ................................................................16

*United States v. Summers*,
  666 F.3d 192 (4th Cir. 2011) .............................................12, 42, 44

## **Statutes**

12 U.S.C. § 2607 .......................................................................... 2

12 U.S.C. § 2614 ...................................................................39

28 U.S.C. § 1291 ...................................................................37

28 U.S.C. § 2111 ...................................................................48

## **Other Authorities**

Policy Statement on Sham Controlled Business Arrangements, 61 Fed. Reg.
  29,258-29,264 (June 7, 1996) ..........................................3, 4, 10, 46

12 C.F.R. § 1024.14 ...............................................................22

FED. R. CIV. P. 49 ..................................................................................... 18

FED. R. CIV. P. 50 ............................................................................... 20, 21

FED. R. CIV. P. 51 ..................................................................................... 18

FED. R. CIV. P. 54 ..................................................................................... 37

FED. R. CIV. P. 61 ..................................................................................... 48

# I. JURISDICTIONAL STATEMENT

Defendants-appellees ("defendants") agree with the jurisdictional statement submitted by plaintiffs-appellants ("plaintiffs").[1]

# II. STATEMENT OF THE ISSUES

A.    Did the District Court abuse its discretion in denying plaintiffs' Motion for a New Trial on the sole and limited issue of whether Long & Foster Real Estate, Inc. ("Long & Foster") had referred plaintiffs to Prosperity Mortgage Company ("Prosperity") when:  (i) the evidence on the issue reasonably supported the jury's verdict; (ii) plaintiffs failed to preserve this issue by moving for judgment as a matter of law; and (iii) plaintiffs requested the very question that they now claim was error to include on the Special Verdict Form?

B.    Did the District Court err in entering judgment against plaintiff Lizbeth Binks when, in response to the court's request, plaintiffs failed to identify any basis for separating her claim from those barred by the jury verdict?

C.    Did the District Court abuse its discretion in connection with the admission of limited fact evidence that pertained to Prosperity's competitive loan pricing when the evidence was relevant and plaintiffs opened the door to it on multiple occasions?

---

[1]    Because plaintiffs no longer seek to appeal the judgment on the certified class's claims, defendants will proceed by separate motion to withdraw their cross-appeal on class certification and whether a cause of action under Section 8(c)(4) even exists.

D.    Did the District Court abuse its discretion by not instructing the jury to disregard an isolated remark made during the closing argument by counsel for Wells Fargo Bank, N.A. and Wells Fargo Ventures, LLC (collectively, "Wells Fargo") where the remark merely addressed the themes expressly raised in plaintiffs' closing and did not prejudice plaintiffs?

## III.    STATEMENT OF THE CASE

After a five-week trial at which the plaintiff class attacked Prosperity's very legitimacy, a 10-person jury returned a unanimous verdict in defendants' favor. The jury flatly rejected plaintiffs' class claims that defendants violated Section 8(c)(4) of the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. § 2607(c)(4), by either (1) operating Prosperity as a "sham" mortgage lender, or (2) operating Prosperity as a mortgage broker that simply referred all of its business to Wells Fargo Bank. This appeal does not seek to upset the jury's rejection of plaintiffs' Section 8(c)(4) claims.[2]

Instead, plaintiffs hope to resurrect their individual claims under RESPA Section 8(a). Those claims are barred, because the jury's special verdict resolved an essential element of a Section 8(a) claim against plaintiffs. On appeal, plaintiffs contend that the district court abused its discretion by denying their Motion for a

---

[2]    Defendants deny that plaintiffs ever stated a viable claim under Section 8(c)(4) of RESPA. Section 8(c)(4) is an exemption to Section 8 of RESPA. It cannot form the basis for an independent cause of action. Plaintiffs, however, have not challenged the judgment issued on their Section 8(c)(4) claims in this appeal.

2

New Trial on the Section 8(a) claims and entering judgment for defendants. [D.E. 618] (as amended by [D.E. 639]).

**A.    General Background And Pre-Trial Procedural History**

As the jury unanimously concluded, Prosperity is a mortgage lender. It was formed in 1993 as a joint venture between affiliates of Long & Foster and Wells Fargo. From the start, plaintiffs' central theory in this case has been that Prosperity is a sham that served merely as a front for Wells Fargo Bank, N.A. ("Wells Fargo Bank") and/or a conduit for referrals from Long & Foster to Wells Fargo Bank, with Long & Foster reaping the rewards through the payment of a share of Prosperity's profits.

Plaintiffs brought this action asserting several claims under RESPA. First, they contended that the arrangement violated the referral fee prohibition under Section 8(a), on the theory that a supposed overpayment for Prosperity Mortgage Corporation's ("PMC") assets in 1993 was a prohibited payment for future referrals. Second, they contended that defendants violated RESPA's safe harbor for affiliated business arrangements set out in Section 8(c)(4), either because Prosperity was a "sham" rather than a *bona fide* provider of settlement services within the meaning of HUD's 1996-2 Policy Statement on Sham Controlled Business Arrangements, 61 Fed. Reg. 29,258-29,264 (June 7, 1996) ("HUD Policy Statement"), or because Prosperity was an undisclosed mortgage broker, not a

3

mortgage lender, that referred all of its customers to Wells Fargo – the alleged "true" lender.  *See* [D.E. 263 ¶¶ 26-28, 40-41; D.E. 513 at 2-3].[3]

Plaintiffs filed a motion for class certification of their RESPA claims.  [D.E. 185].  The District Court declined to certify plaintiffs' referral-fee claims under Section 8(a).  While not addressed by the court, its decision was consistent with well-established authority.  *See Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 530 (7th Cir. 2012) (explaining that "RESPA Section [8(a)] kickback cases . . . are generally not a good fit for class action treatment" and citing cases).  It did, however, certify broader claims for violation of RESPA Section 8(c)(4) and the HUD Policy Statement.  [D.E. 253 at 64-65].  The certified class was originally defined to include,

> All consumers who have obtained a federally-related mortgage loan originated by Prosperity Mortgage Company that was funded by transfers from a line of credit at Wells Fargo Bank, any of its subsidiaries or any of their predecessors, on or after December 26, 2006.

[D.E. 253 at 64-65].  The December 2006 date was tied to RESPA's one-year statute of limitations; the class was later expanded to include a much larger class of individuals whose claims were outside the limitations period, but who asserted that they could establish equitable tolling.  Named plaintiff Lizbeth Binks joined the

---

[3]    Over the five years until trial, this case was aggressively litigated by all parties.  Approximately 34 depositions were taken, and hundreds of thousands of documents were produced.

case to represent the "tolling class;" as pleaded, her claims were identical to the other named plaintiffs' in every respect except for timeliness.  [D.E. 307 at 28]. On April 26, 2013, shortly before trial, the District Court decertified the tolling class and narrowed the class definition to include only "[i]ndividuals who were referred to Prosperity Mortgage by Long & Foster, and … whose loans were transferred directly to Wells Fargo by Prosperity Mortgage."  [D.E. 542]; *see also* [D.E. 635 at 2].

**B.    The Trial**

From May 6, 2013 through June 6, 2013, the parties tried the Section 8(c)(4) class claims.  The uncertified claims under Section 8(a), and Binks's individual Section 8(c)(4) claim, were deferred until after the class trial.

The core issue addressed at trial was whether Prosperity was a *bona fide* and independent provider of settlement services under the requirements of the HUD Policy Statement – rather than a "sham."  This same theory also underpins plaintiffs' claim that defendants violated Section 8(a) – that is, plaintiffs claim that Prosperity was used solely as a vehicle to move referrals from Long & Foster to Wells Fargo.

At trial, defendants established, through testimony and exhibits, that Prosperity was a legitimate correspondent lender with millions of dollars in capital and 300-plus W-2 employees.  Prosperity actively competed in the marketplace

5

and provided valuable and necessary mortgage-lending services to plaintiffs and other borrowers.  In short, it unreservedly satisfied the factors outlined in the HUD Policy Statement.[4]

### C.    The Special Verdict Form

To address plaintiffs' RESPA Section 8(c)(4) "sham" claim, Question 1 on the Special Verdict Form asked the jury "[h]ave plaintiffs proved, by a preponderance of the evidence, that Prosperity was a sham and not a *bona fide* provider of settlement services?"  [D.E. 615 at 1].  The jury answered "No" and accordingly skipped Question 2 (that asked the jury to determine which defendants were liable if they found Prosperity to be a sham).  [*Id.*].

Question 3 asked the jury "[h]ave Plaintiffs proved, by a preponderance of the evidence, that [Long & Foster] referred or affirmatively influenced the Plaintiffs to use [Prosperity] for the provision of settlement services?"  [D.E. 615 at

---

[4]    To determine whether Prosperity was a *bona fide* provider of settlement services, the jury was instructed to apply the HUD Policy Statement to the evidence.  [June 6, 2013 Tr. 26:19-29:25].  The evidence established that Prosperity passed each of the factors outlined in the Policy Statement with flying colors.  Specifically, among other things, defendants proved that (1) Prosperity was sufficiently capitalized ([May 8, 2013 Tr. 120; May 14, 2013 Tr. 188-90; May 15, 2014 Tr. 72-73]); (2) staffed with over 300 of its own employees ([May 8, 2013 Tr. 137; May 15, 2013 Tr. 183; May 23, 2013 Tr. 139; DX102; DX103]); (3) managed its own business through its operating committee, president, and managers ([May 14, 2013 Tr. 196-98; May 15, 2013 Tr. 182-83, 189-90; May 22, 2013 Tr. 88-92; May 23, 2013 Tr. 106-110, 128-30, 135-45]); (4) performed the essential services of a correspondent mortgage lender ([May 23, 2013 Tr. 129, 141-44, 166-78, 181-86; May 29, 2013 Tr. 217-32]); and (5) actively competed in the marketplace ([May 14, 2013 Tr. 142; May 23, 2013 Tr. 213-14; May 29, 2013 Tr. 167-72]).

2]. Plaintiffs had specifically requested that the Special Verdict Form include a question to that effect. *See* [D.E. 556 at 1; D.E. 569 at 1; D.E. 601-2 at 2]. The jury answered "No." [D.E. 615 at 2].

Similarly, to establish that Prosperity served merely as an alleged mortgage broker for Wells Fargo, plaintiffs intended to prove that Prosperity referred their loans to Wells Fargo. For this reason, Question 4 of the Special Verdict Form asked the jury, "[h]ave Plaintiffs proved, by a preponderance of the evidence, that [Prosperity] referred or affirmatively influenced the Plaintiffs to use Wells Fargo Bank, N.A. for the provision of settlement services?" [D.E. 615 at 2]. The jury again answered "No." [D.E. 615 at 2]. This "No" answer established that – *under plaintiffs' theory* – Prosperity did not broker plaintiffs' loans to Wells Fargo; rather, it served as plaintiffs' mortgage lender.

### D. Plaintiffs' Individual Claims Pursuant To RESPA Section 8(a)

As noted, the District Court did not certify plaintiffs' RESPA Section 8(a) claims – *i.e.*, that an alleged overpayment in 1993 somehow caused referrals to be made 20 years later – and, thus, the claims were not formally part of the trial. *See* [D.E. 253 at 64; D.E. 470 at 28; D.E. 534 at 3; D.E. 635 at 3]. Nonetheless, over defendants' objection, the District Court permitted plaintiffs to offer evidence at trial regarding Prosperity's creation in 1993, including whether an overpayment was made as part of the asset purchase transaction. [D.E. 657-1 at 4-5]. The

7

District Court rejected defendants' objection that the 1993 transaction was not relevant to the 2007-2012 class period.[5]  Plaintiffs took full advantage.  Indeed, presumably hoping to taint or confuse the jury, plaintiffs offered copious evidence on the issue, and argued to the jury on several occasions that Norwest, today known as Wells Fargo, improperly overpaid for PMC's assets.  *See*, *e.g.*, [May 7, 2013 Tr. 174-76] (question by plaintiffs' counsel "[PMC], which had been losing money, had accumulated deficits, I think you testified had back office, back office problems, dysfunctional, would you have paid $3.5 million for half of that company?"); [June 5, 2013 Tr. 17] (at closing argument, "how much did Wells Fargo pay for a one-half interest in that company that was worth $150,000? $3.5 million. That should give you an indication as to how much Wells Fargo wanted those referrals from Long & Foster."); [June 5, 2013 Tr. 23] (at closing argument, "[h]ow much did they pay for half that of money losing corporation? They paid, in 1993, $3.5 million. That was a lot of money in 1993. It's still a lot of money today.").

The record, however, ultimately did not support plaintiffs' theory and the jury rejected it in reaching its verdict.  Wells Fargo offered the testimony of Gregory Schwager, Norwest's former in-house counsel who participated in the

---

[5]    *See* [D.E. 534 at 3; D.E. 564 at 1; May 7, 2013 Tr. 130-34].

asset transaction.[6]  Schwager's testimony, which plaintiffs plainly misinterpret and present over four pages as if arguing a summary judgment motion, established that Norwest negotiated and believed that it paid fair value for the assets it purchased from PMC, which included one-half of its goodwill.  [D.E. 621 at 19-20, 22-24, 28-29].  Further, contrary to plaintiffs' statements, Schwager expressly testified that he did *not* have RESPA concerns when the transaction was consummated. [D.E. 621 at 29-30].  By contrast, plaintiffs consistently refused to value anything but PMC's hard, tangible assets and failed to credit evidence that the value of the joint venture was based on the benefits that could be expected from the successful partnership that combined the expertise of both Long & Foster and Wells Fargo.[7]

---

[6]     Plaintiffs refer to Schwager as the "chief negotiator" (Plaintiffs' Opening Brief at 14 (Doc. 43) ("Pls.' Brief")), which is incorrect.  Schwager testified that "the business people that were going to be doing the negotiations with Prosperity, with Long & Foster" were Pete Wissinger and Mike Keller.  *See* [D.E. 621 at 7].

[7]     *See* [D.E. 621 at 10] (Schwager testified that the amount paid for PMC was "based on a multiple of the income that Prosperity would produce … if its operations were improved so as valuation of the existing company improved through management by Wells Fargo"); [*id.* at 11] (Schwager further testified that "when you acquire a business, what you're gonna pay for it is based on the value you expect to get going forward. And it's the same in this case. You know, your -- your payment is based on a multiple of your expected return."); [*id.* at 13-14] (same); [*id.* at 17-18] (Schwager rebuffed the suggestion that PMC lacked value because of operational problems and financial deficits, "That was why there was an opening for us [Wells Fargo] to come in and potentially partner with them [Prosperity] because they didn't have the expertise to run a mortgage lender"); [*id.* at 30] ("Our valuation was based on buying one-half of [PMC] and applying the Wells Fargo approach, expertise, experience to that business going forward. So if we acquired half interest in that company and were able to assist in the

*See* HUD Policy Statement at 29,259 (defining a joint venture as "a special combination of two or more legal entities which agree to carry out a single business enterprise for profit, and for which purpose they combine their property, money, effects, skill and knowledge.").   No legal justification exists to provide plaintiffs with an opportunity to present this same evidence again, particularly where the jury's finding that there was no "referral" in the first instance bars plaintiffs' claims.[8]

### E.     Post-Verdict Proceedings

The District Court directed the parties to state "what remains to be done, if anything, before [the named plaintiffs' individual Section 8(a) claims] can be tried." [D.E. 617].  Plaintiffs recognized that the Section 8(a) claims could not proceed in light of the jury's answer to Question 3.  *E.g.,* [D.E. 657-1 at 2]. Accordingly, they moved for a new trial on that issue.  Plaintiffs never mentioned Binks or suggested that her claims could survive where none of the other plaintiffs' could.

The District Court denied the motion for a new trial.

_____

management and the operations, what would acquiring a half interest in that company be worth."); *see also* [*id.* at 9].

[8]     Defendants retained an accounting expert, Joseph J. Floyd, who analyzed the reasonableness of Norwest's purchase of PMC's assets, including goodwill, and concluded that the transaction was supported by fair value.  *See* [D.E. 421-12 at 3]. Because plaintiffs' Section 8(a) claims were severed from trial, accounting expert testimony was not presented at trial.

10

## IV.    STANDARD OF REVIEW

The Court ordinarily reviews a district court's denial of a motion for new trial only for "clear abuse of discretion" because the "decision to grant or deny a new trial rests with the sound discretion of the district court" given the district court's "intimate familiarity with the trial."  *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994); *see Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 280 (4th Cir. 1999) (when reviewing a motion for new trial on appeal the appellate court must give "the benefit of every doubt to the judgment of the trial judge").  Indeed, a district court's decision on a motion for a new trial "*is not reviewable upon appeal, save in the most exceptional circumstances*."  *Bristol*, 41 F.3d at 186 (emphasis added).

Review is even more deferential under the circumstances here.  Where a party filed a motion for a new trial but not a motion for judgment as a matter of law under Rule 50, this Court is "substantially foreclosed from reviewing the sufficiency of the evidence" and its review of the new-trial motion is limited to the "most deferential appellate review of the evidence."  *Id.*  In these circumstances, where "[t]he record reveals that there is evidence to support the jury's finding" – regardless of the weight of that evidence – the Court must affirm the denial of a motion for new trial.  *Id.* at 188.

11

The District Court's decision to treat Binks's claims as abandoned is reviewed for abuse of discretion. *Smith v. Amedisys Inc.*, 298 F.3d 434, 451-52 (5th Cir. 2002).

The challenged evidentiary rulings are also subject only to abuse-of-discretion review. *See King v. McMillian*, 594 F.3d 301, 310-11 (4th Cir. 2010) (denying appeal of evidentiary rulings because "the district court's careful analysis … merits our deference"). Under this standard, the Court will not find an abuse of discretion and reverse on evidentiary grounds unless the District Court's ruling was "arbitrary and irrational." *United States v. Summers*, 666 F.3d 192, 197 (4th Cir. 2011) (citing *United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir. 1995)).

## V.     SUMMARY OF ARGUMENT

This appeal seeking a new trial is based on plaintiffs' belatedly expressed belief that the jury gave the wrong answer to Question 3 on the Special Verdict Form. Yet, despite the claim that the jury could only have answered this question one way, plaintiffs requested the question be put to the jury and never moved for judgment as a matter of law under Rule 50. Plaintiffs also never sought to act on the statement made in Long & Foster's closing argument, which they claim was a judicial admission, despite more than adequate time to do so. As the District Court noted, "the only reasonable conclusion that the Court can draw from these circumstances is that whether plaintiffs were referred was a fact plaintiffs

12

recognized as disputed right up until the moment they disagreed with the jury's resolution of the issue in favor of Defendants." [D.E. 680 at 7]. This Court should affirm the District Court's decision.

First, because plaintiffs "invited" the very error they complain about, they are foreclosed from relief, even from relief that might be available under the "plain error" doctrine. *AG Sys., Inc. v. United Decorative Plastics Corp.*, 55 F.3d 970, 973 (4th Cir. 1995). Second, plaintiffs cannot seek plain-error review of a jury *interrogatory* under the quite distinct rule allowing limited review of forfeited objections to jury *instructions*, and they cannot show reversible plain error. *Id.* at 973. Third, even ignoring the foregoing principles, plaintiffs' failure to preserve a challenge to the sufficiency of the evidence precludes the relief they seek unless they can show "an absolute absence of evidence to support the jury's verdict." *Bristol*, 41 F.3d at 186. Here that standard cannot possibly be met because the jury's conclusion that Long & Foster did not refer plaintiffs to Prosperity is consistent with the evidence. Plaintiffs' contrary contention ignores (1) the definition of a referral, which involves "*affirmatively influencing*" a person's selection of a provider of a service *for which the person will pay* (*see* n.11, *supra*), and (2) the abundant evidence showing that plaintiffs and other class members selected lenders based on loan terms and a variety of other factors, often coming to

13

the process with predisposed preferences for Prosperity based on prior experience or advertisements.

Plaintiffs' belated theory, that Long & Foster made a judicial admission trumping all evidence to the contrary, fails because the statement was not a "deliberate, clear and unambiguous concession of fact." Nor did plaintiffs act at the time as though it were. Long & Foster consistently claimed that it had no contact with customers, that its independent contractor sales force had the discretion to recommend other providers, and that plaintiffs here affirmatively shopped around and chose Prosperity because it had the best loan terms.

Plaintiffs' sudden desire to litigate Binks's claim separately is of no moment. Binks clearly abandoned her claim when her counsel failed to raise it in response to the District Court's order asking each side what remained to be done following the jury verdict. In addition, the Court can affirm the dismissal of Binks's claim on the independent ground that it is plainly time-barred under RESPA's one-year statute of limitations.

Plaintiffs' additional complaints about the District Court's exercise of discretion to admit evidence have no merit. Prosperity's pricing and ability to compete in the marketplace were directly relevant to plaintiffs' claim that Prosperity was a "sham" provider and was offered in response to plaintiffs' own testimony that they felt "deceived," "cheated," and "bamboozled" by Prosperity.

14

Finally, plaintiffs' complaint about Wells Fargo's closing argument is no basis for reversal.  Plaintiffs take issue with one isolated statement out of hours of closing argument and 17 days of trial.  But plaintiffs never asked the District Court to instruct the jury to disregard that statement or to give any other specific curative instruction, despite ample opportunity.  Moreover, Wells Fargo's counsel's comment squarely fit within the bounds of appropriate advocacy and was in-line with themes already introduced by plaintiffs' counsel.  Plaintiffs can neither connect the comment to the jury's consideration of the referral issue nor meet the difficult burden of showing the requisite "unfair prejudice."

## VI.    ARGUMENT

### A.    The District Court's Denial Of Plaintiffs' Rule 59 Motion Was Well Within Its Discretion And Supported By The Record And The Law.

#### 1.    Plaintiffs invited the submission of Question 3 to the jury and cannot now object to it.

Plaintiffs' assertion that they are entitled to a new trial based on the submission of Question 3 to the jury has no legal merit.  As the District Court aptly recognized, plaintiffs themselves drafted the question, specifically requested that it be included on the Special Verdict Form, and never retreated from that position until *after* the jury returned a negative answer.  As the District Court put it, plaintiffs' contention that the verdict is invalid because the jury answered a

15

question that *plaintiffs* wanted to ask is nothing more than an attempted "game of 'gotcha.'"  [D.E. 680 at 10].

Under the "invited error" doctrine, "a court cannot be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request."  *United States v. Jackson,* 124 F.3d 607, 617 (4th Cir. 1997); *accord, e.g.*, *AG Sys.*, 55 F.3d at 972-73 (party could not appeal the giving of a jury instruction it proposed); *United States v. Runyon,* 707 F.3d 475, 516 n.3 (4th Cir. 2013) (same).  That rule precludes reversal even if the invited error might otherwise have qualified as a reversible "plain error."  *AG Sys.*, 55 F.3d at 973 (rejecting request "to make an exception to [the invited-error] rule by applying a plain-error doctrine to invited errors"); *accord United States v. Hickman,* 626 F.3d 756, 772 (4th Cir. 2010) (the Court generally "will not consider alleged errors that were invited by the appellant," absent "an apparent miscarriage of justice or doubt as to the integrity of the judicial process").

Accordingly, where appellants specifically invited the District Court to commit the alleged error of which they now complain, this Court simply "need not address whether the [court's action] constituted error."  *United States v. Bennafield*, 287 F.3d 320, 325 (4th Cir. 2002); *see also* [D.E. 664 at 9] (citing cases).  Here, plaintiffs concede that they themselves proposed the question to the District Court and maintained it in their proposed verdict form, including after all

16

the evidence was presented.  [D.E. 556; D.E. 569; D.E. 601-2].  Plaintiffs' attempt

to draw a distinction between proposing the particular *wording* of a jury question,

and proposing *the question itself* (Pls.' Brief at 44-45), is completely unavailing.

The point is that *plaintiffs* invited the District Court to ask the very question they

now assert should not have been presented to the jury in the first place.

Plaintiffs also contend that they proposed Question 3 at a time when they

thought it would be appropriate, but that the proof at trial rendered the question

inappropriate.  Pls.' Brief. at 43-44.  Plaintiffs cannot wash their hands of

responsibility for a question that plaintiffs proposed and convinced the District

Court to ask.  If plaintiffs really did harbor some concern about whether Question 3

should be submitted to the jury after the close of evidence, they had ample

opportunity to raise it.[9]  They did not do so; rather, they kept the question in their

final proposed verdict form, three days before submission to the jury.  [D.E. 601-

---

[9]      In fact, defendants – who did object to portions of the verdict form – put
plaintiffs on notice of the need to raise objections to the verdict form before it
was given to the jury.  Defense counsel stated in open court that they needed to raise
their objections before the verdict form was given to the jury, because "[t]he
problem is the Fourth Circuit basically says you have to put it on the record before
it's finalized, and then before it's to be used, you've got to state it again to give the
Judge an opportunity to correct any errors that the Judge may feel upon reflection
should be remedied."  [June 5, 2013 Trial Tr. at 8].  Defense counsel further stated
that "[w]e have researched this issue, and based on our research, it appears [that]
simply referring back to our submissions … may not be sufficient for preserving
the record …."  [*Id.*] at 9.  Based upon these statements alone, plaintiffs should
have raised any objections they had at the same time, but they chose not to.

2]. The District Court properly viewed plaintiffs as adhering to the same position they had consistently taken – that Question 3 should go to the jury. *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1294 (11th Cir. 2002) (finding invited error where party proposed jury instruction and did not later object to it); *Aves v. Shah*, 997 F.2d 762, 766 (10th Cir. 1993).

> 2.    <u>The submission of Question 3 to the jury was not plain error.</u>

Plaintiffs contend that, even if their claim is barred by the invited-error doctrine, this Court should still review for "plain error." That contention fails twice over. First, inviting an error waives *any* claim of error. *AG Sys.*, 55 F.3d at 973; *Hickman,* 626 F.3d at 772; *cf. United States v. Olano*, 507 U.S. 725, 733 (1993) (explaining that "[w]aiver is different from forfeiture" and that a waiver can "extinguish an 'error'"). Second, plaintiffs rely on a rule allowing limited plain-error review of jury *instructions*, FED. R. CIV. P. 51(d), but plaintiffs are complaining about a special jury *interrogatory*, which is governed by FED. R. CIV. P. 49. And "there is no plain-error exception to a party's failure to object to the form of special interrogatories." *AG Sys.*, 55 F.3d at 973. The same rule applies to a party's failure to object to the *giving* of a special interrogatory. *See Deadwyler v. Volkswagen of Am., Inc.*, 884 F.2d 779, 782 (4th Cir. 1989) (declining to review a claim of error because "plaintiffs failed to adequately object to the *submission* of Issue 1, the interrogatory in dispute here") (emphasis added).

18

Even if plain-error review were available, plaintiffs cannot show that submission of Question 3 to the jury was plain error warranting reversal. To establish plain error, plaintiffs must show that (1) there was error; (2) the error was "plain," meaning clear, obvious, and not subject to reasonable dispute; *and* (3) the error affected their substantial rights. *Olano*, 507 U.S. at 732; *Puckett v. United States,* 556 U.S. 129, 135 (2009)*; see also Gregg v. Ham*, 678 F.3d 333, 338 (4th Cir. 2012) (applying *Olano* in a civil case); *Corti v. Storage Tech. Corp.,* 304 F.3d 336, 341 (4th Cir. 2002) (same).[10]

Moreover, even if all three prongs are satisfied, this Court still will not reverse unless the unpreserved error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Olano*, 507 U.S. at 732, 736. Relief on plain-error review is "difficult to get, as it should be." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004).

As shown below, plaintiffs cannot establish any "error," much less any error that is "plain" and prejudicial. But this Court need not even consider those prongs of the test, because it is clear that the District Court's submission of Question 3 to the jury did not seriously affect the fairness, integrity, or public reputation of

---

[10]    Plaintiffs acknowledge the *Olano* standard applies (Pls.' Brief at 47) but then attempt to argue for different factors. While the difference in tests would make no difference to the outcome of this case, the cases cited in the text demonstrate that plaintiffs must satisfy the *Olano* test.

judicial proceedings. *Cf. United States v. Cotton*, 535 U.S. 625, 632-33 (2002) (skipping to the fourth prong of the *Olano* test). Indeed, plaintiffs do not even address this prong of the test.

Ultimately, plaintiffs appear to assert that the District Court erred by failing to decree *sua sponte* that plaintiffs had prevailed on Question 3, rather than submit it to the jury – even though plaintiffs themselves did not even seek such relief, by motion or otherwise. Rather, *plaintiffs* sought the submission of Question 3 to the jury. And "an error that was invited by the appellant cannot be viewed as one that affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Lespier*, 725 F.3d 437, 449-451 (4th Cir. 2013) (citation omitted). To the contrary: "the fairness and public reputation of the proceeding would be called into serious question if [an appellant] were allowed to gain a new trial on the basis of the very procedure he had invited." *United States v. Gomez,* 705 F.3d 68, 76 (2d Cir. 2013).

Moreover, even if plaintiffs had merely forfeited the argument rather than waived it, the "fairness" prong could never *require* the court to take an issue from the jury *sua sponte*. The Federal Rules require a party that wants judgment as a matter of law to make a specific motion, which ensures proper notice and eliminates the potential need for an avoidable retrial. *See* FED. R. CIV. P. 50(a)(2) & Advisory Committee's Note (1991). Even when such a motion is made, a

district judge is *never* required to grant it; it is always permissible to reserve judgment until after the verdict. *See* FED. R. CIV. P. 50(b) & Advisory Committee's Note (1991).

### 3. Plaintiffs' failure to move for judgment forfeited any opportunity to challenge the sufficiency of the jury's verdict.

Plaintiffs incorrectly argue that the District Court abused its discretion in denying plaintiffs' Rule 59 motion because, they claim, the jury's verdict was against the weight of the evidence. *E.g.*, Pls.' Brief at 2, 40. But that is not the standard. Where a party has failed to move for judgment under Rule 50, the inquiry on appeal from denial of a new trial is limited to whether there was an "*absolute absence of evidence*" to support the jury's verdict on that issue. *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001) (emphasis in original). Plaintiffs are quick to emphasize that they were not required to submit a motion under Rule 50 (*see* Pls.' Brief at 32-33) but that is irrelevant. Plaintiffs ignore the *consequence* of opting to wait and seek a new trial post-verdict, rather than moving for judgment under Rule 50(a): they are not entitled to appellate review of whether the weight of the evidence supports that verdict. *See Bristol*, 41 F.3d at 187 ("Bristol's motion for a new trial does not create the avenue for searching review that its failure to move for judgment [under Rule 50] foreclosed.") As this Court has explained,

21

> Were it otherwise, a party could open the door to review via Rule 59, even though its prior failure closed the same door via Rule 50. In reviewing the evidence through the medium of a motion for a new trial after failure to move for judgment as a matter of law, we do not review "sufficiency" in its technical sense.  What is at issue is whether there was an *absolute absence of evidence* to support the jury's verdict.

*Nichols*, 251 F.3d at 502 (quoting *Bristol*, 41 F.3d at 186) (emphasis in original).

4.    <u>The jury's verdict was well-supported by evidence.</u>

On appeal, as well as in their motion for a new trial, plaintiffs have presented the referral issue as if defendants never disputed the notion that Long & Foster routinely referred all customers to Prosperity.[11]  *See, e.g.,* Pls.' Brief at 39. This is not accurate.[12]  Indeed, the evidence to which plaintiffs point in support of their theory that Long & Foster referred all of its customers to Prosperity – for example, the trial testimony of Long & Foster's president and the Alboroughs' real

---

[11]    The jury was instructed that "Referral" under RESPA means

[A]ny oral or written action directed to a person which has the effect of affirmatively influencing the selection by that person of a provider of a settlement service or business incident to or part of a settlement service when the person being referred will pay for the settlement service or business incident to that settlement service or the person being referred will pay a charge attributable in whole or in part to the settlement service or business.

[June 6, 2013 Tr. 25-26]; *see* 12 C.F.R. § 1024.14(f)(1).

[12]    For example, plaintiffs ignore that defendants strenuously opposed *any* certification of a *Minter* class on the grounds that, *inter alia*, the issue of whether Long & Foster referred (*i.e.*, affirmatively influenced) any individual consumer to Prosperity was an individualized factual issue.  *See, e.g.,* [D.E. 479 at 38, D.E. 515 at 8-9]; *see also Gardner v. First American Title Ins. Co.*, No. 00-cv-2176, 2003 WL 221844, at *7 (D. Minn. Jan. 27, 2003); *see also* text at 24-27, *infra*.

22

estate agent, as well as provisions of the 1993 Joint Venture Agreement ("JVA") – supports the opposite conclusion, namely, that referrals did *not* uniformly occur.

To be sure, Long & Foster promoted a "one-stop-shopping" model and encouraged its real estate agents to refer their customers to its affiliated companies, but ultimately, this was a matter of judgment with the agents, who are independent contractors and have their own preferences and relationships. Thus, while plaintiffs' theory at trial was that the JVA inherently required Long & Foster to make referrals to Prosperity[13] (as opposed to envisioning that some referrals naturally would occur), defendants presented evidence that there are numerous individual reasons as to why any Long & Foster agent may (or may not) have recommended Prosperity or why any individual customer may (or may not) have been influenced to use Prosperity.

Importantly, defendants presented evidence that it is the independent real estate agents – rather than Long & Foster or its management – that deal with the customers directly and decide whether and where to refer a given customer for other real estate settlement services. [May 7, 2013 Tr. 142-143, 201]. The evidence showed that some agents made referrals to Prosperity and others did not. [May 7, 2013 Tr. 142:17-143:3, 201:2-5; June 3, 2013 Tr. 81-83]. Indeed, the undisputed capture rate data (the data utilized to identify those Prosperity

---

[13]    [May 7, 2013 Tr. 142:17-143:3].

23

customers who were also Long & Foster customers) consistently showed that Long & Foster was never able to get more than 30% of its buy-side customers to use Prosperity for their mortgage financing needs.  *See* [DX64-69].[14]  For example, Konstantino Tsamouras, the Alboroughs' real estate agent, testified that he would not recommend customers to Prosperity when he did not have confidence or experience with the particular loan officer likely to service his customer.  [June 3, 2013 Tr. 82:15-83:9].  Tsamouras also testified that many of his customers would come with pre-existing preferences about using Prosperity or other lenders ([June 3, 2013 Tr. 79:20-80:25]) and that he frequently recommended other lenders (*e.g.*, Bank of America), or sometimes recommended Prosperity and another lender and let the consumer choose ([June 3, 2013 Tr. 75-76, 83]).

Thus, while plaintiffs put great stock in the trial testimony of Denise Minter ("Minter") and Jason Alborough ("Alborough"), both of whom claimed that Long & Foster referred them to Prosperity, the jury was not bound to accept that testimony, because there was evidence from which it sensibly might have found that a "referral" did not occur within the definition provided to it by the Court (and to which plaintiffs certainly did not object).  While plaintiffs argue that there is no

---

[14]     Of course, as defendants have long argued, even this capture rate data does not necessarily reflect "referrals" within the meaning of RESPA; rather, it merely tracks which Long & Foster customers may have used Prosperity for financing, without regard for how or why they came to make that choice.  *See, e.g.*, [D.E. 479-1 at 33].

statutory requirement that the action in question (*e.g.*, the recommendation) be the *only* reason the consumer chooses the settlement service provider (Pls.' Brief at 10), they cite no authority for this proposition[15] and ignore the definitional requirement that the customer have been "affirmatively influenced" by that action. Accordingly, although plaintiffs argue that a form disclosure (here, Long & Foster's ABA disclosure) itself constitutes a referral (Pls.' Brief at 19, 40), under the plain language of the statute the form cannot be a referral if it did not affirmatively influence a given customer to choose Prosperity.

The jury certainly could have determined that the definition of "referral" that the Court provided did not apply to one or more of the individual named plaintiffs. The jury heard evidence that both Minter and the Alboroughs shopped around for their lender. The Alboroughs conducted independent research on mortgage-financing options. [May 16, 2013 Tr. 112:15-116:20, 117:1-3]. On cross-examination, Jason Alborough conceded that they had not been able to find another lender with better terms than Prosperity. [May 16, 2013 Tr. 117:1-14]. For her part, Minter was a well-educated and savvy consumer. [May 9, 2013 Tr. 132:22-134:2, 137:12-14, 144:16-145:7, 147:4-7]. She, too, shopped around for her

---

[15]    Appropriately, the jury did not receive (nor did plaintiffs request) any such instruction, and plaintiffs offer no citation or support for their argument. Rather, the jury was instructed, "You are permitted to draw, from the facts that you find have been proved, such reasonable inferences as seem justified in light of your experience." [June 6, 2013 Tr. 16:16-19].

lender. [May 9, 2013 Tr. 154:17-155:8, 156:12-157:17]. Based on such evidence and on their own observation of the witnesses' demeanor and credibility, the jury may well have answered "No" to Question 3 because it concluded that any conduct by Long & Foster was not a factor that "affirmatively influenced" each plaintiff to choose Prosperity.

Furthermore, the evidence showed that the Alboroughs received a $5,000 contribution from the seller towards their closing costs. *See* [DX 113 at 286] (Conventional Financing Addendum to Contract of Sale, providing that "Seller agrees to pay $5,000 towards Buyer's Closing Cost…"); *see also* [June 3, 2013 Tr. 76:21-77:3, 79:3-10]. The defense argued this point in closing argument. [June 5, 2013 Tr. 162:11-13] ("Mr. Tsamouras also told you that he negotiated a $5,000 seller's credit for the Alboroughs. Well more than what they paid Prosperity."). Thus, the jury easily could have concluded that the Alboroughs were not "referred" because they did not "pay for the settlement service" (or "pay a charge attributable in whole or in part to the settlement service or business") within the meaning of the referral definition. *See* n. 11, *supra*.

The jury also reasonably could have reached a "No" answer to Question 3 because it did not believe the evidence supported a "Yes" answer that would bind the class as a whole (*i.e.*, because it concluded that the evidence did not support a "Yes" for every class member). That clearly was a permissible interpretation of

26

Question 3.  Indeed, the Court advised the jury at the onset of the case that "the outcome of your decision as to the plaintiffs, Miss Minter and the Alborough[s] will apply to the class as a whole."  [May 7, 2013 Tr. 5:17-18].[16]  Here again, there was evidence from which the jury might have found that many class members would have chosen Prosperity apart from any action by Long & Foster or its independent sales agents, such as the evidence that some Long & Foster customers had pre-existing preferences about using Prosperity or other lenders, or that Prosperity competes for Long & Foster business against other lenders like Wells Fargo and Bank of America.  *See* [May 7, 2013 Tr. 142-43; May 23, 2013 Tr. 204-08, 213-14; May 29, 2013 Tr. 167-72; June 3, 2013 Tr. 79-80, 81-83].

Finally, plaintiffs miss the mark with their concocted argument (Pls.' Brief at 20-21) that defendants' provision of a revised class list to exclude Prosperity customers who had not utilized Long & Foster as their real estate broker following the Court's decertification decision somehow constituted a concession that the remaining persons on the list were "referred" to Prosperity by Long & Foster. Plaintiffs conveniently ignore that in providing the revised list, defendants expressly cautioned that as "previously noted, the capture rate data *does not necessarily reflect referrals – it merely tracks which Long & Foster customers may*

---

[16]    Likewise, plaintiffs' counsel, Mr. Gordon, reminded the jury during closing argument that this case "is a class action" and "is not just about Denise Minter and the Alboroughs."  [June 5, 2013 Tr. 14:10-12].

27

*have used Prosperity for financing regardless of whether the customer was "referred" under the meaning set forth in section 8 of RESPA.*"  [D.E.  673-5 at 1 n.1] (emphasis added).  Plainly, defendants did not "concede" that the individuals on the revised class list were referred to Prosperity; they expressly disclaimed doing so.

In sum, there were no concessions of the referral issue and there was ample evidence to support the jury's verdict as to Question 3, which more than satisfies the "most deferential appellate review of the evidence" that asks whether there was *any* evidence to support the verdict.  *Nichols*, 251 F.3d at 501-02  Indeed, the District Court, in denying the motion for a new trial – which was also limited to this single referral issue – went out of its way to express its agreement with the jury's verdict, thus plainly manifesting that the District Court believed that there was more than just "any" evidence to support it.  [D.E. 680 at 2 n.2].

5. <u>Defense counsel's statement in closing argument does not require a new trial.</u>

Plaintiffs argue that a single comment made by Long & Foster's counsel, Mr. Varon, in his closing argument constituted a judicial admission of the referral issue that now justifies a new trial.  *See* [D.E. 657-1 at 11-12].  Plaintiffs, however, did not object to the instruction or act in any way on the claimed judicial admission.  In any event, the statement in question is not a judicial admission, does not require a new trial, and does no injustice to plaintiffs.

28

The scope of a judicial admission by counsel is restricted to clear and unequivocal statements as to matters of fact that otherwise would require evidentiary proof. *See FOP Lodge No. 89 v. Prince George's County*, 608 F.3d 183, 190 (4th Cir. 2010) (although a lawyer's statements may constitute a binding admission of a party, any such statement must be "deliberate, clear, and unambiguous" before it will be afforded preclusive effect) (internal citation omitted); *Robinson v. McNeil Consumer Healthcare*, 671 F. Supp. 2d 975 (N.D. Ill. 2009) (defense counsel's statement at closing did not qualify as a judicial admission because it was not an unequivocal admission or deliberate waiver, and the jury's finding of contributory negligence was supported by evidence).

Here, the statement was by no means a "deliberate, clear and unambiguous" concession of fact. To begin with, Mr. Varon's comment was made at the very beginning of his closing argument for Long & Foster and Walker Jackson, immediately following a long closing argument by plaintiffs' counsel, Mr. Gordon. In his closing, Mr. Gordon made many factual assertions and metaphors – including the contentious suggestion that the jury should "follow the money," as in "Watergate" ([June 5, 2013 Tr. 39:23-40:3]) – which defendants believed did not square with the record or common sense. Mr. Varon's argument included the following response:

> First of all, at the outset, I would just ask you to ask yourselves
> if your assessment of the witnesses, of the documents, of their

29

credibility, *of what you heard in this case really matches what Mr. Gordon told you*. It's your job to weigh what occurred here. And frankly, I'm sure you won't be surprised, I have a lot of differences, and *differences of recollection, differences in what was said*. I think the only thing I agree [with] for sure is that Long & Foster did refer the named plaintiffs to Prosperity. There's no dispute about that.

[June 5, 2013 Tr. 80:11-21] (emphases added).  As is clear from his phrasing as well as the full context, Mr. Varon was simply making a spontaneous observation that his personal recollection and interpretation of the evidence adduced at trial vastly differed from the version that Mr. Gordon had just offered in his closing.  In other words, Mr. Varon's response to Mr. Gordon's description of the evidence was that virtually the only aspect that Mr. Varon did not remember differently was that Minter and Alborough had testified that Long & Foster referred them to Prosperity (*i.e.*, Mr. Varon did not dispute that there had been such testimony).[17]  *See Robinson*, 671 F. Supp. 2d at 981 (defense counsel's statement in his closing argument that defendant was not blaming plaintiff did not amount to a judicial

---

[17]    By way of further background, Mr. Gordon had just made numerous representations to the jury in his closing argument as to what he believed the evidence had shown at trial – each of which, in defendants' view, was a preposterous characterization of what the evidence had been.  Of these assertions, the only one that defendants would *not* dispute was as to the named plaintiffs' testimony.  Thus, Mr. Varon pointed that out, and went on to illustrate, that Mr. Gordon's other assertions about the evidence were fanciful or plainly incorrect. *See, e.g.*, [*id.* at 80:23-81:1] ("I was kind of surprised, to kind of hear the conspiracy theories, alpha numeric secret codes, follow the money. You know, I don't quite know where those things came from…").

30

admission precluding defendant from prevailing on its contributory negligence defense where remark was "simply attorney argument responding to [opposing] counsel's previous comments" rather than a "deliberate, clear, and unambiguous" recognition that plaintiff was not negligent). Plaintiffs simply cannot show that Mr. Varon's lone comment regarding referrals was a deliberate, voluntary concession of a fact at issue. *See Eli Lilly & Co. v. Valeant Pharms. Int'l*, No. 08-cv-1720, 2011 WL 573761, at *3 (S.D. Ind. Feb. 15, 2011) (statements by counsel, taken in full context, did not rise to judicial admissions where position expressed related primarily to counsel's theory of case rather than a knowing concession of fact).

The Sixth Circuit's decision in *Harrison Construction Co. v. Ohio Turnpike Com.*, 316 F.2d 174 (6th Cir. 1963), as the District Court recognized, is instructive here. [D.E. 680 at 9]. In *Harrison*, the trial court denied the award of certain damages. On appeal, the appellant claimed that this finding was precluded by opposing counsel's statement in his opening that "I think the evidence will show that the damage proximately resulted (sic) from the Commission's failure to provide sufficient right-of-way did not exceed $50,000," which the appellant claimed was a judicial admission of causation. *Id.* at 176-77.

Acknowledging that admissions of counsel generally "may dispense with proof of facts for which witnesses would otherwise be called," the Sixth Circuit did

31

not view counsel's statement as a judicial admission, because, among other reasons, the appellant had never insisted, during trial, that that the appellee was bound by any admission as to causation in his opening statement, proof of the issue was taken at trial, and counsel's statement was clearly inconsistent with the appellee's pleadings, evidence, and closing argument.  Finally, the statement in question was not free of equivocation "and no attempt was made by the Court or opposing counsel to determine the purpose of the remarks." *Id.* at 177. Accordingly, the Court of Appeals could only conclude that "it occurred to no one at the trial that the remarks in question constituted an admission of the nature here urged." *Id.*

Plaintiffs unpersuasively seek to distinguish *Harrison* on the grounds that the parties in that case disputed the underlying issue, whereas, according to plaintiffs, "Long & Foster ***never*** disputed that it referred Plaintiffs (and other Timely Class members) to Prosperity" and the alleged admission "conformed to all the evidence."  Pls.' Brief at 39.  In reality, however, the *Harrison* court's logical and persuasive reasoning is directly on point here.

Defendants' fundamental position throughout this litigation – including the decertification argument, which Mr. Varon argued – was that plaintiffs would *not* be able to prove that all class members were referred to Prosperity by Long & Foster.  *See, e.g.*, [D.E. 479-1 at 33] (arguing that just because class members used

32

Long & Foster as a broker does not mean they were "referred" (*i.e.*, "affirmatively influenc[ed]") by Long & Foster to select Prosperity because, for example, "such class members could have been repeat Prosperity customers; they could be friends or relatives with loan officers or employees of Prosperity; they could have believed that Prosperity offers great services and pricing because of their own experience working at Long & Foster; or they could have received a recommendation from a friend or relative."). For precisely that reason, the defense adduced such evidence at trial (and, in closing, reminded the jury of the evidence that the Alboroughs' seller's credit exceeded the sum of all charges made to them by Prosperity). *See Finjan, Inc. v. Symantec Corp.*, No. 10-cv-593, 2013 WL 5302560, at *25 (D. Del. Sept. 19, 2013) (aside from counsel's alleged judicial admission of patent infringement during his closing argument, there was no evidence in the record or in the litigation of the action, indicating that his client admitted to infringement).[18]

Moreover, similar to *Harrison*, plaintiffs themselves did not treat Mr. Varon's statement as a concession of fact; they did not contend that it removed Question 3 from dispute at any time before the jury was charged, despite adequate

---

[18]     Plaintiffs also do not cite any authority suggesting that Mr. Varon's statements could bind the other separate (and separately represented) parties so as to render the issue entirely undisputed. To the contrary, even where judicial admissions are made, they can only bind "the party making them." *Rohn Prods. Int'l LC v. Sofitel Capital Corp. USA, Inc.*, 2010 WL 681304, at *4 (D. Md. Feb. 22, 2010) (citing *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995)).

33

time to do so.[19]  As in *Harrison*, the statement by Mr. Varon was not unequivocal, nor was any attempt made by the District Court or plaintiffs' counsel to determine its purpose.  Mr. Varon did not state that the element of referral had been proven, nor did he concede it or tell the jury what result to reach on Question 3.  To the contrary, as the jury was clearly instructed, it was the *jury's* recollection and assessment of the evidence that mattered, and the jury was to disregard any statement made by the attorneys that did not comport with the evidence.  [June 6, 2013 Tr. at 17:2-10].[20]  The jury was entirely free to weigh the evidence and return a "No" verdict as to Question 3.  The importance of the requirement that a statement by counsel must be "deliberate, clear, and unambiguous" to constitute a judicial admission cannot be illustrated any better than in a class action case such

---

[19]    Mr. Varon gave Long & Foster's closing argument early on June 5, 2013, and the jury was not charged until the following morning.  In the interim, plaintiffs had time to absorb the supposed judicial admission – during two other closings from the defense, plaintiffs' own rebuttal closing, argument heard after closing arguments, overnight, and even during the morning before the jury was instructed. Indeed, on the morning of June 6, before the jury was instructed, plaintiffs submitted a brief that did not address Question 3's inclusion ([D.E. 607]), and the District Court approved final changes to the jury instructions ([June 6, 2013 Tr. at 3:5-4:12, 11:21-25]).

[20]    In fact, in response to various concerns raised by both parties after the closing arguments concluded (including as the meaning of a "referral" under RESPA, *see* [D.E. 609 at 2-4]), the District Court specifically instructed the jury that that to the extent any attorney made a statement about RESPA that is different from what the Court told it in the instructions, the jury was to follow the jury instructions, and not consider any contrary statements by counsel.  [June 6, 2013 Tr. 17:11-20].

as this, where plaintiffs are arguing (post-verdict) that this single phrase during argument warrants a new trial for 40,000 consumers on an issue that was already central to a 17-day trial.[21]

Plaintiffs' reliance on the district court cases of *Childs v Franco*, 563 F. Supp. 290 (E.D. Pa. 1983), and *Hall v. Wal-Mart Stores, East L.P.*, 447 F. Supp. 2d 604 (W.D. Va. 2006), is unavailing. Both cases are distinguishable because the statements at issue were clear and unequivocal. *See Finjan*, 2013 WL 5302560, at *25 (distinguishing *Childs* because attorney's closing argument regarding patent infringement was not unequivocal and, therefore, would not result in a binding admission on the client). Indeed, the *Hall* court emphasized that "only statements that are 'clearly established' by counsel will be treated as judicial admissions" and expressed concern that counsel's statement at issue may have caused the other side to refrain from putting on evidence with respect to the issue conceded. *Hall*, 447 F. Supp. 2d at 607, 608.

Finally, the District Court had the discretion not to treat the statement as a binding judicial admission at all. *See McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 682 (7th Cir. 2002) (whether to construe a party's statement as a binding judicial

---

[21]    *See generally Oscanyan v. Arms Co.*, 103 U.S. 261, 263, 26 L. Ed. 539 (1880) ("[I]f a doubt exists as to the statement of counsel, the court will withhold its directions, as where the evidence is conflicting, and leave the matter to the determination of the jury.").

35

admission is discretionary with the court); *Coral v. Gonse*, 330 F.2d 997, 999 n.1 (4th Cir. 1964) (same); *United States v. Belculfine*, 527 F.2d 941, 944 (1st Cir. 1975) ("[C]onsiderations of fairness and the policy of encouraging judicial admissions require that trial judges be given broad discretion to relieve parties from the consequences of judicial admission in appropriate cases.").  In light of the absence of a clear and unequivocal admission, the District Court's ruling was well within its proper discretion and should be affirmed.

### B.     The District Court Properly Dismissed Binks's Section 8(a) Claim.

Plaintiffs argue here for the first time that the District Court's judgment should not have included Binks's individual Section 8(a) claim.  Binks was added to this action as a named plaintiff to represent a class of time-barred claimants.  *See* [D.E. 253 at 59-60; D.E. 263 ¶¶ 98-110].  When the District Court decertified the tolling class, Binks's individual claim under Section 8(a) remained.  [D.E. 541 at 6-11].  But when the District Court asked what remained to be done in the case following the jury verdict, counsel representing all plaintiffs, including Binks, submitted a joint filing that *never mentioned Binks's claim*, let alone any reason why judgment should not be entered on it along with all other remaining claims. The District Court did not abuse its discretion by entering judgment when Binks

36

never asked it to do anything else.[22]  Any remaining claim by Binks would be time-barred in any event, and a remand would be futile.

1.    Plaintiffs abandoned Binks's individual Section 8(a) claim by failing to raise them below.

The District Court was entitled to dismiss Binks's Section 8(a) claim because plaintiffs abandoned it.  Courts are authorized to dismiss claims *sua sponte* for failure to prosecute, and such dismissals are reviewed for abuse of discretion. *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629-33 (1962).  A court does not abuse its discretion in dismissing a claim where a plaintiff fails to bring claims to the court's attention when it is clear that the court does not believe they remain active.  *Smith v. Amedisys Inc.*, 298 F.3d 434, 451-52 (5th Cir. 2002).  That is exactly what happened here.

Binks did not press her claims below.  After the District Court entered judgment for defendants on the class Section 8(c)(4) claims, it issued an order requesting the parties' positions on how to handle the "outstanding" issue of "the

---

[22]    Indeed, the abandonment is necessary to sustain jurisdiction over this appeal. Binks had both an individual Section 8(a) claim *and* an individual Section 8(c)(4) claim identical to those the class plaintiffs took to trial.  Plaintiffs' appeal does not address the Section 8(c)(4) claim at all.  If *Binks* contends that she did not abandon her claims, *she* must explain what happened to the Section 8(c)(4) claim.  If the District Court did not enter judgment on that claim, then the judgment below would not be final as to "all the claims" of "all the parties," FED. R. CIV. P. 54(b), and this Court would lack appellate jurisdiction over any portion of this appeal under 28 U.S.C. § 1291.  Defendants' position is that the Court has jurisdiction because *Binks* abandoned both of *her* claims.

37

Named Plaintiffs' individual § 8(a) claims." [D.E. 617]. As plaintiffs concede, the "Named Plaintiffs" include Binks. Pls.' Brief at 50.

Yet plaintiffs' joint submission in response to the District Court's order wholly ignored Binks's Section 8(a) claim. Plaintiffs' submission simply stated, without differentiating between Binks and the other named plaintiffs, that they desired to bring the Section 8(a) claims to trial but that such a trial was estopped by the jury's verdict. *See* [D.E. 622 at 1-3]. Accordingly, plaintiffs stated, they would move for a partial new trial. [*Id.*] Nowhere did plaintiffs reference any claim that could survive if the new-trial motion were to be denied. [*Id.*]. And in the Rule 59 motion that followed, plaintiffs again failed to mention Binks, or otherwise to treat her separately from the other "Named Plaintiffs." [D.E. 657-1]. And Binks made no separate filing.

Binks abandoned her individual claim by failing to prosecute it or even to acknowledge its existence when the District Court asked. *Amedisys*, 298 F.3d at 451-52. Just as in *Amedisys*, plaintiffs here "never suggested to the trial court that [they] had … any other claims" other than those addressed by their new trial motion, and "it appears that neither the parties nor the trial court" believed that Binks's claims remained active. *Id.* In fact, Binks's abandonment is even clearer than in *Amedisys*, because here there was a court order explicitly calling for a submission addressing "outstanding" issues. [D.E. 617].

38

In short, the District Court could not have abused its discretion by dismissing Binks's Section 8(a) claim after she failed to raise it. That is ample basis to affirm the judgment against Binks.

> ### 2. In any event, the District Court properly dismissed Binks's Section 8(a) claim because it was time barred.

The Court can also affirm the judgment against Binks because the record demonstrates that her loan closed more than one year before plaintiffs filed suit in this case. Her claim, thus, is barred by RESPA's one-year statute of limitations. 12 U.S.C. § 2614.

To overcome the statute of limitations, plaintiffs argued below that Binks's claims were saved by equitable tolling, but the uncontested facts show that Binks does not satisfy the tolling requirements. The District Court's conclusion that her tolling claim was facially sufficient and required further factual development misapplied the applicable legal principles. On *de novo* review, *see Lone Star Steakhouse & Saloon v. Alpha of Virginia., Inc.*, 43 F.3d 922, 928 (4th Cir. 1995), Binks's equitable-tolling claim fails.

Application of the "quite narrow" tolling doctrine must be "guarded and infrequent," and this Court has not hesitated to reverse district courts' unjustified expansions of it. *Chao v. Va. Dep't of Transp.*, 291 F.3d 276, 283 (4th Cir. 2002). To invoke tolling, Binks needed to prove: (1) fraudulent concealment of "facts that are the basis of" her claim, (2) failure to discover those facts within the statutory

39

period, and (3) due diligence. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995). Here, the uncontested facts put Binks on inquiry notice of her claim even before her loan closed, and well outside the limitations period. Because she nevertheless failed to pursue her claims diligently, she is not entitled to equitable tolling. *Chao*, 291 F.3d at 284; *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007).

"Inquiry notice is triggered by evidence of the possibility of fraud, not by complete disclosure of the alleged scam." *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993). "Where a plaintiff knows a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the plaintiff is on inquiry notice of his claim." *GO Computer*, 508 F.3d at 179.

Binks received numerous disclosures describing the relationship among defendants, putting her on inquiry notice of her claims. Two affiliated business arrangement disclosures revealed, together, that Prosperity was affiliated with both Long & Foster and Wells Fargo. [D.E. 419-2 ¶¶ 249, 255-257; D.E. 275-2 at 14-15, 22-23]. Those documents stated that defendants might receive financial benefits from referrals to one another. [D.E. 275-2 at 58, 85]. A disclosure at closing told Binks that the servicing of her loan would be "assigned, sold or transferred" from Prosperity to Wells Fargo. [D.E. 419-2 ¶¶ 263-264; D.E. 275-2

40

at 41-42]. Other documents disclosed that Wells Fargo Home Mortgage would collect the payments on her loan and that her insurance policy should list Wells Fargo Bank as the mortgagee. [D.E. 419-2 ¶ 265; D.E. 275-2 at 35-36, 40-41]. Such disclosures put Binks on inquiry notice of her claims and courts have repeatedly refused to toll RESPA's statute of limitations in such circumstances. *See Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 423 (6th Cir. 2009); *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 577-78 (N.D. Cal. 2007).

Despite such inquiry notice and her own feeling that "everything had [not] been done right" ([D.E. 275-2 at 38]), Binks idly sat on her rights during the limitations period. Tolling demands due diligence, which "requires reasonable investigation of the possibility of misrepresentation." *Brumbaugh*, 985 F.2d at 162. Yet Binks made no inquiries until her attorneys contacted her, after the statute of limitations had expired. [D.E. 419-2 ¶¶ 275-276; D.E. 275-2 at 15, 51-52, 57-58]. Binks's complete failure to inquire is even less than the "unpursued inquiry" that this Court held to be inadequate in *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219 (4th Cir. 1987). Indeed, even the District Court noted that it had "difficulty in concluding that the jury could find that Binks exercised due diligence." [D.E. 470 at 36].

The District Court held, however, that it might have been "reasonable" for Binks not to ask questions before closing ([D.E. 470 at 36]) and that it was unclear

41

whether any inquiry would have been successful ([*id.* at 37]).  Both of these

justifications run contrary to precedent.  This Court held in *Chao* that

"'reasonableness' is not the touchstone of equitable tolling" and that even a

reasonable failure to exercise diligence precludes tolling.  291 F.3d at 284.  And

this Court held in *GO Computer* that diligence is required regardless of whether

further inquiry was likely to reveal the full details.  508 F.3d at 179.  Binks's

complete lack of diligence renders her indistinguishable from *GO Computer*'s

"negligent plaintiff."  *Id.*

Accordingly, Binks's claims are time-barred, which is further reason for this

Court to affirm.

### C.    The Admission Of Evidence Regarding Prosperity's Competitive Pricing Was Neither Erroneous Nor Prejudicial.

#### 1.    The District Court properly allowed limited testimony regarding the fairness of plaintiffs' loan transactions and Prosperity's competitive pricing.

Plaintiffs have not (and cannot) satisfy the high standard of demonstrating

that the District Court's evidentiary rulings on Prosperity's competitive pricing

were "arbitrary and irrational."  *Summers*, 666 F.3d at 197.  In fact, the District

Court's rulings were consistent and well-reasoned.

In their brief, while lamenting the District Court's alleged "flip-flop" on the

admission of evidence of economic harm, plaintiffs fail to disclose a critical fact to

the Court.  While the District Court granted plaintiffs' motions *in limine* regarding

42

evidence of economic harm, it expressly stated that "if Plaintiffs open the door to evidence of economic injury during their case-in-chief, [the Court] will reconsider this decision." [D.E. 553 at 2]. At trial, plaintiffs did exactly that by repeatedly suggesting that the jury infer that they (and the class) were harmed by choosing Prosperity.

For example, when asked by his attorney how he felt about his Prosperity loan, Alborough testified that he "felt taken, *cheated*." [May 17, 2013 Tr. 77:19-21] (emphasis added). On cross-examination, Alborough reiterated that "not that this is the end of the world, but it … seems as if we were still cheated and taken … [and] deceived … [and] that the package we were sold was laden with things that were not right for us and not in our best interest." [*Id.* at 161:3-6; 166:2-4]. Minter made similar statements. Specifically, in response to a question on direct examination about how she felt about her Prosperity transaction, Minter responded that "I feel that it was very deceptive. I work hard for my money and make informed decisions about where I spend my money. So I just wanted to know on the information up front. So I'm not very pleased with the transaction." [May 9, 2013 Tr. 129:22-25]. On cross-examination, Minter further explained that she felt "bamboozled" by defendants. [*Id.* at 183:4-6].

Plaintiffs' testimony that they felt, among other things, deceived, bamboozled, taken, and cheated – assertions that plaintiffs' counsel emphasized at

closing argument – clearly implied to the jury that plaintiffs suffered some sort of financial or economic injury as a result of using Prosperity. Thus, the District Court correctly concluded that it would unfairly prejudice defendants to then preclude them from eliciting testimony rebutting that implication. [May 9, 2013 Tr. 188:16-23; May 16, 2013 Tr. 124:7-125:2] (cross-examination of Alborough on whether he received the "best loan" for him was "appropriate" because he says "he felt cheated"); *see also United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) ("relevance typically presents a low barrier to admissibility … to be admissible, evidence need only be 'worth consideration by the jury,' or have a 'plus value.'"). There is simply no basis to conclude that the District Court's decision to allow this testimony was "arbitrary and irrational." *Summers*, 666 F.3d at 197; *see also United States v. Halteh*, 224 F. App'x 210, 215 (4th Cir. 2007) ("Our precedent is clear that otherwise inadmissible evidence may be permitted for the limited purpose of removing any unfair prejudice injected by an opposing party's 'open[ing] the door' on an issue.").

Similarly, the very limited testimony of Wells Fargo's Joseph Rogers (a member of Prosperity's Operating Committee) and of Prosperity's President Randall Krout regarding the competitiveness of Prosperity loan prices was directly relevant to refute plaintiffs' insinuations that Wells Fargo and Long & Foster unjustly earned more than "a hundred million dollars" from Prosperity at the class

44

members' expense (*see* [May 7, 2013 Tr. 25:24-25:6]) and that Prosperity is essentially the same as Wells Fargo retail, including with respect to loan prices. *See* [May 8, 2013 Tr. 50:10-51:3] (eliciting testimony that Prosperity "got the same products at the same price" as Wells Fargo); [May 7, 2013 Tr. 35:15-18] ("We will give you some evidence, and this is just one more little piece of this, you'll hear evidence that Wells Fargo simply treated Prosperity as another retail branch, another region of Wells Fargo."). Plaintiffs' questioning suggested to the jury that the loan prices are identical regardless of whether a borrower gets the loan from Prosperity or Wells Fargo. This testimony was prejudicial to defendants and they had a right to rebut it, which they did in a very limited fashion. *See Halteh*, 224 F. App'x at 215; *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1424-25 (10th Cir. 1991) (otherwise inadmissible evidence of financial condition permitted when objecting party "opens the door" to such testimony).[23]

> 2. <u>The challenged evidence is relevant to plaintiffs' substantive claims and thus its admission cannot form a basis for reversal.</u>

Even if the evidence challenged by plaintiffs was not relevant to rebut testimony elicited during plaintiffs' case-in-chief, it was independently relevant to plaintiffs' substantive claims and thus cannot form the grounds for reversal. The

---

[23]    Likewise, there can be no concern that the probative value of the challenged testimony "would be substantially outweighed by a danger of unfair prejudice" when plaintiffs injected the issues of economic harm and the competitiveness of Prosperity's rates into the trial in the first place.

Fourth Circuit has held that "even if the grounds that the district court gave for admitting the evidence are improper, generally *this Court will reverse only if there are no grounds upon which the district court could have properly admitted the evidence*." *United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir. 1995) (emphasis added). Here, testimony that plaintiffs and class members received fair and competitively-priced loans is directly probative of whether Prosperity functioned as a *bona fide* lender and competed in the marketplace as such. Indeed, under the HUD Policy Statement, Factor 9 asks, in part, whether the "entity actively compet[es] in the market place for business[.]" 61 Fed. Reg. at 29,262. As Prosperity's president testified, one of the ways Prosperity wins business in a very competitive market is by offering better and lower pricing on its loan products. *See* [May 23, 2013 Tr. 213-15].[24]

---

[24]    Defendants retained an expert, Dr. Marsha Courchane, who analyzed the actual mortgage loan pricing terms that Prosperity customers received as well as analogous data for customers of Wells Fargo Bank retail branches that operate in the same footprint. Dr. Courchane concluded that Prosperity loans typically feature lower rates and origination costs than those of competing Wells Fargo retail branches, which were also representative of the marketplace. *See* [D.E. 421-6 at 11, 23, 24; D.E. 421-7 at 15; D.E. 421-19 at 184-85]. The District Court granted plaintiffs' motions *in limine* and excluded Dr. Courchane's testimony. Neither her reports nor testimony were permitted to be offered or introduced at trial, despite defendants' objections. However, nothing in the District Court's April 30, 2013 order expressed any concern with defendants eliciting testimony from plaintiffs about their loan transactions and how they felt about them.  *See* [D.E. 553 at 1-2].

Additionally, testimony about why plaintiffs chose Prosperity as their mortgage lender was relevant to the question of whether plaintiffs chose Prosperity because they were allegedly "affirmatively influenced" by Long & Foster to do so. For that reason, the District Court held, pre-trial, that defendants would be permitted to "question the Named Plaintiffs about 'shopping around' for their mortgages and whether they chose Prosperity because it was offering better rates, lower costs, or better service." *See* [D.E. 564 at 2]. The District Court position on this issue remained consistent throughout the trial. *See* [May 9, 2013 Tr. 155-56, 187-89; May 16, 2013 Tr. 124-25; May 22, 2013 Tr. 104-09].

Moreover, as the District Court explained at each of the bench conferences plaintiffs requested on this issue, there is a distinction between evidence that Prosperity competed on pricing in the marketplace and evidence of whether plaintiffs suffered harm. *See* [May 22, 2013 Tr. 108] (testimony from fact witnesses regarding Prosperity's competition in pricing "is an entirely different situation than if Dr. Courchane were here to testify") (*see* n. 24, *supra*). Indeed, the pricing issue went directly to plaintiffs' theory that Prosperity was a sham that just added to the costs of the process rather than providing valuable and necessary services. *See* [May 22, 2013 Tr. 106] (Court recognizing that Prosperity's pricing was "certainly relevant to the competition issue"); [*id.* at 10] (holding plaintiffs' objections unfounded as economic harm was "not related [to] where [the

47

defendants] are going or their purpose" in asking about Prosperity's competitive pricing.)

Accordingly, the jury was entitled to hear that testimony and weigh and balance it with the other evidence presented. *See Leftenant*, 341 F.3d at 346 ("to be admissible, evidence need only be 'worth consideration by the jury,' or have a 'plus value.'").

> 3.    Even if improper, admission of the challenged evidence did not "substantially sway" the judgment and thus was harmless error.

Even if the challenged testimony was improperly admitted, it was harmless error and did not materially impact the jury's verdict. Under the harmless error doctrine, the Court cannot reverse a judgment based on an error that did "not affect the substantial right of the parties." 28 U.S.C. § 2111; *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984); *see also* FED. R. CIV. P. 61. To affirm a judgment where the District Court admitted evidence in error, the Court "need only be able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole that the judgment was not *substantially swayed* by the error[s].'" *United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *United States v. Byers*, 649 F.3d 197, 211 (4th Cir. 2011). Here, plaintiffs' speculation that the challenged testimony explains the jury's verdict is unfounded and unsupported and in no way demonstrates that the challenged

48

testimony "substantially swayed" the jury's verdict. Pls.' Brief at 35. Nor do they ever tie the testimony to the jury's answer to Question 3.

Plaintiffs point to only four very brief portions of testimony and one short section of Wells Fargo's closing argument, which together comprise less than three pages of trial testimony. Pls.' Brief at 54. The *Minter* trial took place over 17 days and the trial transcript comprises more than 3,500 pages, including testimony from 23 witnesses. Plaintiffs fail to explain, other than through pure speculation, any causal connection between the jury's verdict and the negligible volume of challenged testimony. Pls.' Brief at 55. Indeed, the District Court directly responded to plaintiffs' claims in their Rule 59(a) motion that "the jury shirked its obligation to thoroughly, and in good faith, consider the evidence in this case." [D.E. 680 at 2 n.2]. Specifically, the judge found that "the length of the jury's deliberations [are] unremarkable given the threshold questions they answered, *and [which are] consistent with his own opinion of the merits of Plaintiffs' case as a whole*." [*Id.*] In other words, according to the judge who sat through 17 days of trial, the verdict was entirely unsurprising in light of the merits of the case. *See Johnson*, 54 F.3d at 1162 ("Due to the large number of witnesses and extensive evidence …, the district court acted within its discretion in admitting the [challenged evidence]."); *United States v. Grooms*, 2 F.3d 85, 89-90 (4th Cir. 1993) (upholding verdict).

49

Moreover, the District Court explicitly addressed the concerns raised by plaintiffs with respect to the limited testimony that they challenge by instructing the jury (orally and in writing) that plaintiffs were "not required to prove they were overcharged by any of the defendants in connection with their loans, or that they incurred any financial detriment, or that they've suffered any poor service as a result of their dealings with the defendants." [June 6, 2013 Tr. 22: 21-25; 24:8-13]. In light of the limited testimony at issue, the substantial evidence that supports that Long & Foster did not refer plaintiffs to Prosperity, and the explicit jury instructions on this issue, the "exceptional circumstances" necessary to justify a reversal simply do not exist. *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 355-56 (4th Cir. 1994); *Johnson*, 54 F.3d at 1162*; see also Dillon v. Maryland-Nat'l Capital Park & Planning Comm'n*, 258 F. App'x 577, 579 (4th Cir. 2007) (affirming admissibility of evidence where limiting jury instruction mitigated any prejudicial impact).

### D.    The District Court Properly Overruled Plaintiffs' Objection To A Statement Made By Wells Fargo's Counsel In Closing Argument.

Closing argument in this case occupied a full trial day. Plaintiffs now, for the first time, challenge a single, isolated comment by Wells Fargo's counsel, Mr. Bourgeois, that squarely fits within the bounds of appropriate advocacy and was in-line with themes already introduced by plaintiffs' counsel. At least *eight* times during his initial closing argument, plaintiffs' counsel asked the jury to "follow the

50

money" when considering their claim that Wells Fargo was plaintiffs' actual lender. [June 5, 2013 Tr. 39:24-25; 40:3; 40:4; 42:6; 43:15; 43:21; 47:2; 66:3-4]. In response, each of the defendants similarly asked jurors to "follow the money" when considering the evidence rebutting plaintiffs' claim that Prosperity was not a mortgage lender. [*Id.* 81:15-22; 113:19-20; 141:19-22; 142:20-25; 144:23-145:2].

Plaintiffs' concern regarding the purported "disparaging remarks" made by defendants' counsel is a classic red herring. While plaintiffs suggest that the remarks constitute grounds for a new trial, plaintiffs have made it clear that they do not actually want a new trial. *See* Pls.' Brief at 27 ("Plaintiffs do not seek a retrial of their §8(c) claims, even though the District Court's errors…[for] not striking and curing counsel's inflammatory closing attack on Plaintiffs' counsel, entitle them to that remedy"). Plaintiffs do not rely upon the challenged statement at issue to support their claim for a new trial on the referral-fee issue. Further, plaintiffs do not (and cannot) connect the remarks regarding "following the money" or the interests of counsel to the "first trial" they seek on the "referral" issue.

Regardless, plaintiffs would not be entitled to such relief. In considering whether comments made during a closing are so egregious that they amount to "unfair prejudice," the court must weigh: (1) the nature of the misconduct, (2) the extent of the improper conduct, (3) the issuance of curative instructions, (4) any conduct by one side inviting the purportedly improper response, and (5) the weight

51

of the evidence.  *See United States v. Adams*, 335 F. App'x 338, 348 (4th Cir. 2009).

Here, the nature and extent of the alleged improper remark was insignificant. Plaintiffs take issue with one isolated passage out of hours of closing argument and 17 days of trial.  And while plaintiffs stated an objection to the remark during defendants' closing – which the District Court properly overruled – plaintiffs never asked the District Court to instruct the jury to disregard the statement and otherwise did not ask for a specific curative instruction even though the parties offered curative instructions on other issues before the jury charge was given.  *See* [June 5, 2013 Tr. 186:7-13] (failing to state basis for objection); [June 6, 2013 Tr. 39:9-11] (in response to District Court's question if there were any other concerns with the jury instructions given, plaintiffs' counsel stated "None for the plaintiffs, Your Honor"); *see generally* [June 5, 2013 Tr. 215:1-230:13] *and* [June 6, 2013 Tr. 2:2-13:2] (parties addressing requests for curative instructions after hearing closing arguments).  Even if the jury somehow misinterpreted the remark, the District Court made clear in the jury charge that "the statements, the objections, or arguments that were made by counsel are not evidence in the case."  [June 6, 2013, Tr. 17].  Wells Fargo's counsel made the same point himself.  *See* [June 5, 2013 Tr. 170:23-171:15] ("I hate to say it, but nothing I'm telling you right now is evidence.").  Moreover, as discussed above, the uncontroverted evidence supports

52

the jury's verdict – including its answer to Question 3, which is the only aspect appealed by plaintiffs.  *See* Section VI.A.4, *supra*.  And, in light of the themes and preceding statements offered by plaintiffs' counsel, defense counsel's "remarks" simply do not rise to the level of egregious conduct constituting fraud on the court or unfair prejudice.  *See United States v. Duckett*, 861 F.2d 715, at *2-3 (4th Cir. 1988) (unpublished) (rejecting argument that remark in closing directed at opposing counsel warranted a new trial where it was made in response to opposing counsel's closing argument and "there is simply no evidence that the statement prejudiced the [opposing party] in any way"); *Adams*, 335 F. App'x at 348-49 (no unfair prejudice when remarks at issue were made in context of responding to opposing counsel's statements).

Plaintiffs' chief complaint is that attacks on the integrity of opposing counsel may be grounds for a new trial.  Pls.' Brief at 56-57 (*citing Bufford v Rowan Companies, Inc.*, 994 F.2d 155 (5th Cir. 1993)).  Those grounds do not exist here and plaintiffs' reliance on *Bufford* is misplaced.  In *Bufford*, defense counsel suggested on various occasions during the trial that plaintiffs' counsel had filed a copycat lawsuit based on their role in similar lawsuits and suggested that plaintiffs had prosecuted fraudulent claims.  994 F.2d at 158.  "The damaging aspersions began with the opening statement," "they were an integral part of the defense," "building to a crescendo at the end of the trial."  *Id.* at 157 (noting that the conduct

53

was "more than isolated remarks"). The tipping point came when the judge exacerbated the prejudice to the plaintiffs when his threat to jail plaintiffs' counsel was overheard by the jury despite being made during a sidebar conference. In *Bufford*, there was an extended course of conduct throughout the trial of attacks on plaintiffs' counsel and plaintiffs, and a combination of facts involving the trial judge that led to the risk of a tainted verdict. *Id.*; *see and compare All Freight Sys. v. James*, 115 F. App'x 182, 187-88 (5th Cir. 2004) (unpublished) (distinguishing *Bufford* and affirming denial of a motion for new trial where opposing counsel's allegedly improper remarks were stray and "did not rise to the level of egregious conduct necessary to constitute fraud on the Court.").

Nothing like the *Bufford* course of conduct occurred here. Plaintiffs do not argue (nor could they) that during the course of the five-week trial, defendants somehow attacked plaintiffs' counsel's integrity, or otherwise attempted to paint counsel as "greedy class action attorneys" as they now suggest. Pls.' Brief at 58.[25] That the jury reached its verdict in a relatively short period of time has nothing to do with a stray comment made during a closing summation, but has everything to do with the substantial evidence presented over the course of a long and fair trial.

---

[25]    By way of contrast, during the trial plaintiffs' counsel improperly attacked defendants' counsel by suggesting to a witness (who had no way of knowing one way or the other) that all of the defendants' counsel were members of the witness's trade organization (which is not the case) and that, therefore, the witness's testimony was unworthy of belief. [May 21, 2013 Tr. 182:3-183:15].

54

## VII.  CONCLUSION

Defendants respectfully request that the jury's verdict and the District

Court's denial of plaintiffs' motion for new trial be affirmed in full.

Respectfully submitted,


*/s/ Irene C. Freidel*          */s/ John A. Bourgeois by permission*
Irene C. Freidel                Andrew Jay Graham
Brian M. Forbes                 John A. Bourgeois
K&L GATES LLP                   KRAMON & GRAHAM, P.A.
One Lincoln Street              One South Street, Suite 2600
Boston, Massachusetts  02111    Baltimore, Maryland  21202
(617) 261-3100                  (410) 752-6030


*Counsel for Wells Fargo Bank, N.A., and Wells Fargo Ventures, LLC*


*/s/ Jay N. Varon by permission*
Jay N. Varon
Jennifer M. Keas
FOLEY & LARDNER LLP
3000 K Street, N.W.
Washington, D.C.  20007
(202) 672-5300


*Counsel for Long & Foster Real Estate, Inc., The Long & Foster Companies, Inc., and Walker Jackson Mortgage Corporation*


*/s/ David L. Permut by permission*
David L. Permut
William M. Jay
Sirisha V. Kalicheti
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 346-4000


*Counsel for Prosperity Mortgage Company*


Dated:  January 21, 2014


56

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13-2131        **Caption:** Minter, et al. v. Prosperity Mortgage Co., et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains ____13,937____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 [*identify word processing program*] in Times New Roman, 14 point [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) /s/ Irene C. Freidel

Attorney for Wells Fargo

Dated: January 21, 2014

## CERTIFICATE OF SERVICE

I, Irene C. Freidel, do hereby certify that on January 21, 2014, I have caused to be served on all parties or their counsel of record the foregoing, through the CM/ECF system.

*/s/ Irene C. Freidel*
Irene C. Freidel